[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
CORRECTED MEMORANDUM OF DECISION
This is an appeal brought pursuant to § 7-250 of the General Statutes by Industrial Development Group (IDG), from decisions of the Water and Sewer Authority of the Town of Watertown (Authority), approving assessments of special benefits against certain real property, now or formerly of IDG, located in the Town of Watertown.
Appeals under § 7-250 are trials de novo, O'Rourke v. Cityof Stamford, 179 Conn. 342, 345 (1979), and the court has broad equitable powers to alter or confirm assessments. Vaill v.Sewer Commission, 168 Conn. 514, 519 (1975).
In the instant case, the defendant Authority clearly has the right to levy an assessment on plaintiff's properties equal to the additional value conferred thereon as a result of the availability of a sewer system. § 7-249, Connecticut General Statutes.
 "The principle upon which a valid assessment . . . must rest . . . is that the owner of the property is "assumed to be benefited by the improvement to the extent of the assessment; and it is imposed and collected as an equivalent for that benefit and to pay for the improvement." Connecticut Railway Lighting Co. v. Waterbury, 127 Conn. 617 (1941).
The monetary value of the benefit conferred upon a piece of property is the difference in the fair market value of the realty with and without the sewer system, even though such a measurement may mean that the costs cannot be fully recouped by the town. Bridge Street Associates v. Water Pollution ControlAuthority, 15 Conn. App. 140, 144 (1988).
 "Whether an assessment exceeds the special benefit to the property, as measured in this fashion, is a question of fact for the trial court, and its finding as to that fact will not be disturbed unless it is clearly erroneous" Bridge Street Associates, supra, 144.
"On appeal, the introduction of the assessment CT Page 6641 raises a presumption as to its regularity, validity and correctness. `Until it is proven to the contrary, the city is presumed to have set the assessment legally, and thus introduction of the assessment roll into evidence constitutes prima facie proof that the assessment does not exceed special benefit." Katz v. West Hartford, 191 Conn. 594 (1983).
 "The burden of proving that a special benefit assessment is invalid because it exceeds the particular dollar benefit accruing to the land is on the property owner. As is true in all cases, the plaintiff must prove the allegations of his complaint. The standard of proof is that of a fair preponderance of the evidence." Bridge Street Associates, supra, 143.
The defendant is the duly authorized Water and Sewer Authority of the Town of Watertown, Connecticut, having all of the powers and duties set forth in Connecticut General Statutes Chapter 103 Municipal Sewerage Systems. Defendant, John Salamone, is Principal Administrative Officer of the Authority and Phillip Deleppo is the Director of Public Works for the Town.
IDG is a Connecticut partnership which has been engaged in the purchase, sale and development of industrial properties in Watertown. Some of IDG's industrial property was affected by the Authority's extension of sewer lines in its Turkey Brook Sanitary Sewer Project, completed in three phases.
Phase I of the project extended the sanitary sewer line from the south side of Connecticut Route 262, under the highway and northerly in the course of Turkey Brook, to the junction of the east and west branches of the brook, then along the west branch to a point approximately 200 feet south of the southerly boundary of the "UPS property". Phase I was complete and available for connection on January 31, 1987. Phase II continued along the west branch of the brook, from the terminus of Phase I in a northerly direction, across Echo Lake Road. Phase II was complete and available for connection on August 17, 1988. Phase III ran along the east branch of the brook, from its junction with the west branch in a northeasterly direction and across Echo Lake Road. The final phase was complete and available for connection on July 5, 1990. CT Page 6642
On April 15, 1985, the town passed an ordinance appropriating $391,000.00 for the construction of Phase I of the project and on March 23, 1987, an ordinance appropriating $250,000.00 for Phase II.
Earlier, on May 13, 1987, IDG purchased approximately 24.957 acres of undeveloped land located at the southeast corner of Park Road and Echo Lake Road in Watertown, which it subdivided on September 13, 1988, into six lots.
On August 17, 1988, the Phase II completion date, IDG owned Lots 3, 4, 5 and 6, all industrially zoned, in that subdivision known as the Park Road Industrial Park, and all were affected by the Phase II extension. Subsequently, during 1991, IDG resubdivided this property by dividing Lot 4 into two lots referred to as New Lot 4 and Lot 7.
IDG had one other parcel that was affected by the Turkey Brook Project and in particular, Phase III. That parcel contains approximately 33.8 acres (referred to hereafter as Lot 23A), and is located on the north side of Echo Lake Road. It is a portion of a large 70 acre tract purchased by IDG on July 16, 1986 from Robert D. Cura Spray Trust.
All of IDG's properties are located in a neighborhood known as the Watertown Industrial Park area. The area includes industrial properties on Buckingham Street, Echo Lake Road, Callendar Road, Connecticut Route 262, and connecting roads. this neighborhood is bounded to the north by Mattatuck State Forest; to the east by Connecticut Route 8; to the south by Connecticut Route 262; and to the west by Buckingham Street. It is conducive to industrial development as a result of its proximity to Connecticut Route 8, a major highway serving western Connecticut. Also, the area has favorable feeder roads which are a positive factor for industrial development. It is agreed that the highest and best use of each of plaintiff's lots as of the relevant assessment dates is for development as industrial properties and, as of August 17, 1988, the Phase II completion date, several sizeable facilities had already been constructed in the area.
On February 6, 1988, the Town of Watertown passed an ordinance appropriating $330,000 for the construction of Phase III of the Turkey Brook Sewer Extension Project, and as indicated, Phase III was completed on July 5, 1990. CT Page 6643
On that date, IDG was still the owner of the 33.8 acre lot 23A. Approximately 11.1 of those acres were situated in an R-80 residential zone with the remainder of the property being industrially zoned.
At its meeting of November 5, 1992, the Authority passed a resolution establishing final sewer assessments for all phases of the project.
The Authority's Resolution for Phase II includes four properties of the plaintiff. These properties are identified in the Resolution as properties #8 (Lot 5, Park Road Industrial Park); #9 (Lot 4, Park Road Industrial Park); #11 (Lot 5 Park Road Industrial Park); and #12 (Lot 6, Park Road Industrial Park). These properties were assessed $26,000.00, $49,000.00, $42,000.00 and $63,000.00, respectively. The Authority's Resolution regarding Phase III includes one property of the plaintiff, identified as property #14 (Assessor's Lot 23A, raw land), assessed for $50,000.00.
Accordingly, the Authority issued its Notice of Assessment to IDG in those amounts.
The plaintiff filed a timely appeal of all five assessments with this court on December 1, 1992, alleging ownership of all five properties. Subsequently, the plaintiff amended its appeal to allege the sale of Lot 3 on October 8, 1991, more than one year prior to the date the appeal was filed; the sale of lot #4 on December 3, 1992, and the sale of Lot #7 (second lot created from lot #4) on December 22, 1992. IDG retains ownership of Lot #6 and Lot #23A, and has owned both continually from the date of purchase through the time of trial. By virtue of its continuing ownership of lot 6 and 23A, the court finds that IDG is aggrieved by the Authority's assessment of special benefits as to those parcels.
Prior to trial, but after the date of completion of Phase II, IDG sold Lots 3 and 5, and resubdivided Lots 4 and 7 in the Park Road Industrial Park. Upon the sale of Lots 3, new 4, 5 and 7, IDG and its purchasers entered into agreements pursuant to which IDG remained fully responsible for the payment of any assessment of the subject properties which might finally be determined, and whereby IDG was authorized to prosecute an appeal as to each assessment in its own name. None of IDG's CT Page 6644 transferees of lots 3, New 4, 5 and 7 have any financial interest in the outcome of the instant appeal.
With regard to the question of aggrievement, General Statutes § 7-250 provides that any person aggrieved by an assessment may appeal. Therefore, the statute does not restrict aggrievement to property owners.
For classical aggrievement, the plaintiff must have 1) personal and legal interest in the decision; 2) plaintiff's interest must be specifically and injuriously affected by the decision. Primerica v. Planning Zoning Commission, 211 Conn. 85,93, 558 A.2d 646 (1989).
Aggrievement is a question of fact. Id. A zoning case applying a classical aggrievement test states: "The extent to which a party with an interest in the property other than that of an owner is aggrieved depends upon the circumstances of each case, because the concept of standing is a practical and functional one designed to ensure that only those parties with a substantial and legitimate interest can appeal an order." Id.
See also Light Rigging Co. v. DPUC, 219 Conn. 168, 172-3,592 A.2d 386 (1991).
The court finds that IDG has such a substantial and legitimate interest by virtue of its continuing obligation and its exclusive responsibility for payment of the assessment of special benefits attributable to lots 3, 4 and 5. Consequently, IDG is aggrieved by the Authority's assessment as to those lots.
As indicated above, when assessing the special benefit provided to real estate by the availability of sewers, the appraiser's task is to determine the market value of the property before sewers became available and to subtract that value from the market value of the property when sewers became available, after adjusting for all other factors that influence value. The difference between the two values thus determined equals the special benefit to that parcel of real estate.
Both parties and their appraisers agree that "Market value" means the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming price is not affected by undue stimulus. CT Page 6645
Further, they favor the sales comparison approach for appraising the subject properties, as the cost and capitalization approaches are inapplicable.
The sales comparison approach requires the appraiser to identify comparable sales during a relevant time period, and then to adjust the sale price of the comparable sales to the subject lots, based on a variety of factors. This, the parties have attempted to do with great detail.
Further, the plaintiff has, with its appraisal report, exhibits and witnesses, produced sufficient evidence to rebut the presumption of validity initially afforded defendant's assessments. However, the defendant's per acre valuation for both acreage with and without sewer availability is the more reasonable and credible determination of same and therefore, is adopted by the court. Those per acre valuations pertaining to IDG's lots 3, 4, 5 and 6 are $16,000.00 per acre for lots without sewers and $30,000.00 per acre for lots with same. The per acre values that pertain to IDG's lot 23A are $13,000.00 and $18,000.00 respectively.
Both appraisers have determined that the market value of the lots for both before and after sewer availability is a function of the useable area of each multiplied by the appropriate per acre monetary value reflecting before or after sewer availability.
In its computations, the Authority multiplied its per acre values by the estimated useable acreage of each lot. IDG, while using different values, used the actual acreage as determined by its engineering survey.
Under the circumstances, use of actual useable acreage and the per acre values as found by defendant and adopted by the court, is the more reasonable way to find value, as it lends itself to a fair determination of the special benefit conferred on each of plaintiff's lots with the exception, however, of lot 4.
On the respective dates of completion of Phases I and II, lots 3, 4, 5, 6 and 23A consisted of the following acreage: CT Page 6646
LOT ACRES
 3 1.84 4 5.67 5 4.61 6 5.88 23A 30.8
The Authority's appraiser estimated the useable acreage of each as follows:
LOT ACRES
 3 1.84 4 3.5 5 3.0 6 4.5 23A 10.0
However, the actual useable acreage of each was determined to be:
LOT ACRES
 3 1.19 4 0.95 5 1.96 6 2.93 23A 6.4
After multiplying the per acre dollar value, representing before and after sewer availability, by the estimated useable acreage of each lot, the Authority determined that the monetary value of the special benefit conferred was as follows:
LOT
 3 $26,000.00 4 49,000.00 5 42,000.00 6 63,000.00 23A 50,000.00
However, IDG, using the actual useable acreage and different per acre values, contends that the benefit or increase in value attributable to each lot is as follows: CT Page 6647
LOT
 3 $ 4,000.00 4 3,000.00 5 9,000.00 6 12,000.00 23A 33,000.00
The court, using the per acre values of $16,000.00 without and $30,000.00 with sewers, and the actual useable acreage of each lot, except lot 4, finds the monetary values of the special benefits conferred as follows:
Lot 3:
1.19 x $30,000.00 = $35,700.00
1.19 x $16,000.00 = 19,040.00
Value of special benefit $16,660.00
Lot 5:
1.96 x $30,000.00 = $58,800.00
1.96 X $16,000.00 = 31,360.00
Value of special benefit $27,440.00
Lot 6:
2.93 x $30,000.00 = $87,900.00
2.93 x $16,000.00 = 46,880.00
Value of special benefit $41,020.00
Lot 23A:
6.4 x $18,000.00 = $115,200.00
6.4 x $13,000.00 = 83,200.00
Value of special benefit $ 32,000.00 CT Page 6648
As indicated, IDG's lot 4 contains 5.67 acres of which only 0.95 acre is useable land. In the absence of sewer availability, the lot would probably be unmarketable because of the difficulty and cost involved in installing a sub surface sanitary septic disposal system on such a small parcel and still leave room for above ground improvements.
IDG claims that the benefit of sewer availability to this property is $3,000.00. The court, however, believes that this mere sum is considerably less than the cost of installing a sub surface system on the lot. After the sewer became available to lot 4, said lot was subdivided into two lots and both were sold. This certainly would not have been possible without sewers.
Earlier, the court found the value of the benefit sewer availability has conferred on lot 3, containing 1.19 useable acres, to be $16,660.00. As indicated, IDG's ability to subdivide lot 4, with less than one useable acre, into two industrially zoned lots and then to sell them for a total sales price of $195,000.00 is, in large part, a result of sewer availability. Consequently, the court finds that the value of the benefit conferred on lot 4 is approximately two times that conferred on lot 3, or $33,320.00.
Therefore, as to all lots, the assessments are modified as follows:
Lot 3 assessment reduced from $26,000.00 to $16,660.00
Lot 5 assessment reduced from $42,000.00 to $27,440.00
Lot 6 assessment reduced from $63,000.00 to $41,020.00
Lot 23A assessment reduced from $50,000.00 to $32,000.00
Lot 4 assessment reduced from $49,000.00 to $33,320.00
Judgment for the plaintiff may enter in accordance with the foregoing, together with costs, including a reasonable appraisers fee of $7,500.00.
WEST, J. CT Page 6649